Holt v. Commonsealth of Pennsylvania If it please the Court, I am Alexis Lehman on behalf of the Plaintiff. I want to embarrass you by asking if you actually wrote the brief, but I have to tell you, you have distinguished, whoever wrote the brief, distinguished themselves. It may be in 22 years in this Court, in 10 years in a trial court, the most incomprehensible, illiterate brief I have ever seen. So it certainly is not distinguishing me in a good way, but it certainly stands out amongst briefs. But go ahead with the other one. I know that Your Honors are all familiar with the case, so I'm not going to... I'm not that familiar with it because I said it. It was not easy to figure out what the heck happened. What was the dollar award of damages funded to come out of all this? How much money did your client ultimately cover? I'm not worried about compensative versus punitive. What was the total dollar amount? The jury award in the first case was $50,000. What was the total amount that your client ended up with after all this is over with? $2.2 million, I believe. That's after all the remittance? $2.2 million, but then it was taken away by Judge Strawbridge, correct? That's correct. Take it down to what? Based on the remittance that we accepted, it's $100,001. $101,000? No, $100,001. As in George Washington? Yes, as in George Washington. You never waived your right to go back, if we were to reverse, to go back to the other damages, correct? If there were a reversal, our argument is that the only issue would be a new trial on damages, not on liability. Did you offer the opportunity to take a new trial rather than take the remittance? You said you agreed to the remittance. Were you offering the option of a new trial versus remittance, or did Judge Strawbridge simply say, you're getting a remittance, this is the dollar figure you're getting? Judge Strawbridge combined. He said that if we didn't take the remittance, we'd have to go to a new trial on liability and damages, which is why my client accepted that. I believed that you weren't allowed to combine both. That was the option that we were given. I believe that it was in my client's best interest to take the $100,000. Can I say why you would have to go back for a new trial on liability as opposed to damages on remittance? He did in his 84-page memorandum. It was the last portion of that, I believe on page 77 to 84, that he goes over the remittiture as it is to defending Winterbottom and what our option was. And in his very lengthy opinion, he states why the – he gives, I believe, one citing of a case law that says he's allowed to do both for us to get a new trial on liability and damages. I was going to briefly go over the facts of the case. We know the facts of the case. Okay. If there's nothing – if there's no specific issues that you'd like me to address, I will try to decipher the brief that I presented. Why was Judge Strawbridge wrong in reversing – I mean in granting the judgment notwithstanding the verdict as to several of these situations? I'm going to first start – because there was two trials here, I'd like to start with the first trial if that's what you're asking. There's certain issues. Number one, regarding just the first trial, Judge Strawbridge did not allow us to amend our complaint to include an additional claim of First Amendment retaliation to Defendant Johnson. And our argument is that based on trial testimony that our client engaged in protected activity, that the plaintiff engaged in protected activity. But he concluded that it would have been futile to amend because it really wasn't protected activity. Yes, he did. Okay. All right, I think your brief covers that. Okay. I was – How about the adverse action aspect that kind of threads throughout the – his opinion? The instructions on adverse action were nonexistent. In other words, there is no indication in the instructions as to what an adverse action really is under the law. I mean, adverse action is a significant change in employment status, such as hiring, firing, failing to permit reassignment, specifically different response to a decision causing a significant change in benefits. That was not – the jury was not instructed on that, was it? I – That's a no. It was not. It was not. So isn't that really good for you in terms of Judge Storbridge then saying that the jury got it wrong with respect to adverse action? Because the jury had never been instructed as to what an adverse action was. What were they supposed to do? Isn't that good for you? I'm not sure if it's good. I'm throwing you a softball. Yeah, there's a stash right in front of the plate. They just haze it if you hit it. And you're taking a strike at it. I guess it was good for me because the jury got it in our favor. Exactly. And there was – I mean, for him to then say, well, you got the adverse action wrong because it wasn't an adverse action when he hadn't defined it for the jury seems strange to me. I'll bring this up with the Commonwealth for sure. So there is multiple adverse actions. I'll take them entirely unless you have one specifically that you'd like me to address. At least I'm not. My colleague is suggesting that there aren't adverse actions. The problem is the jury can't make a finding on an adverse action unless it's told under the law what an adverse action is. The jury was never told what an adverse action is. It's possible the jury would hear the legal definition of an adverse action and conclude that, well, we can do the evidence about that. We're not convinced that under the premise of the evidence that it was an adverse action. The jury could hear that and say, my God, if it was an adverse action, if you were the one, here they are. But how do we know that unless the jury's told that? If the jury wasn't told that, I'm not going to speculate as to how they came to that conclusion. But this is an issue that was previously decided where we proved our prima facie case, which is the plaintiff was in a protected class, he had an adverse action taken against him, and then we proved causation. This is at stages before a trial even took place. So for the judge to come back now after not only one trial but the second one and say, oh, wait, you didn't have an adverse action to begin with, you already held that it was an adverse action in multiple other instances. Well, that's the difference of one pretrial that there's enough which is amazing, which is not on the record, to get over that hurdle, and that doesn't necessarily mean all that means is that if the plaintiff can establish these facts, yes, the plaintiff can make out a part of his case. That would mean the fact can be established. But the problem here is there's not enough guidance given the jury for us to determine that you did not establish this. If you knew about the establishment, the jury just didn't know what to do with the evidence that it heard. Okay. Well, assuming that the jury did not get the instruction on what an adverse action was, the plaintiff certainly proved that at trial. So going to the first adverse action in issue was, number one, the comments made by Defendant Braille. These were the discriminatory comments, right? The argument that both defense counsel and judge... Do you want to say something? No, I'm good. Okay. The argument that both defense counsel and judge Straubridge make is that the comments in and of themselves didn't have any effect on the plaintiff's employment, and at trial that was disproved. Winterbottom and Braille both testified that those comments, that he was going to be banished to the Poconos, there were some various curse words thrown in there, that he was not going to see the Poconos Station as long as I and Winterbottom are here. That had direct correlation to Winterbottom's decision not to place him in the King of Prussia Station, which is a more advantageous and prestigious position. Braille testified that he talked to Winterbottom about the state of the Poconos Station, right? We have the two different stations. And Winterbottom then says, yeah, I talked to Braille about it, and I based my decision off of Braille's assessment. So that creates the link between the comments and the adverse action. The next adverse action that is in question is the initiation, and only the initiation, of the internal affairs investigations. And Johnson, Braille, and Winterbottom, all three defendants, initiated internal affairs investigations against the plaintiff. And the crux of this argument is that Johnson himself, as well as the court, says even a pending internal affairs investigation can affect your promotion, it can affect the way that you are received in the department, it can affect the way that your supervisors see your decision-making ability, and then the court even comes in, J1920. We know, with respect to the decision that Captain Johnson made as to the Reading Patrol Sergeant, that it, the pending internal affairs investigation, had an impact. So that's the defendant in the court's own statement. So we've gone over the comments and the internal affairs investigations, and those are both, I believe that we've stated and that we've drawn to the trial testimony that those are both indeed adverse actions. Had the jury known how to assess it? The jury what? Had the jury known how to assess that in its charge? If we were to reverse or vacate Judge Straubach's order, what damages would you be entitled to? We believe that we would be entitled to compensatory punitive damages. But in what amount? Would it come back to the $2 million? That is up to the panel to decide. That is one of the actions under 15C. What's your argument on that? What? What's your argument on that? Clearly we have to decide that. Well, compensatory damages, it's the standard of what's reasonable. And then punitive damages is what's outrageous. I mean, they were awarded by the jury. If we say that Judge Straubach was wrong in overturning the jury's verdict, then is it not your position that the verdict in the amounts would be reinstated? Well, that is our position. Well, you said something about a new trial on damages. I didn't know what you meant there. The argument on having a new trial on damages was to address what we believe is the incorrect standard that was given to us by Straubach, saying that in his reversal of the jury verdict, he was granting a new trial on both. And I was saying, no, you can't do that. Based on your decision to overturn the jury verdict, we're only entitled to or we can only go back for a new trial on damages but not liability. And that was part of the remittance argument. Good. Are there any other specific issues that you'd like to address? Did you save time for rebuttal? I had asked for two minutes for rebuttal. Okay, then you didn't. Okay. That's even an easier softball question than the one Judge Straubach asked you. You can say yes. Okay, thank you. May it please the Court, I'm Claudia Tesoro from the Attorney General's Office. Why isn't there one miss? I mean, how can we not send this back, one, for a new trial, and two, I've never, in Judge Straubach's opinion, he is talking about the testimony that Mr. Holt presented, I think, was going to compensate for damages, and he said, well, Mr. Holt testified about the economic harm of his conduct, but we didn't hear from his family members. Where is it written anywhere that a plaintiff in a case like this, his testimony alone is a jury exception is not enough? I've never seen anything like that. It's an incredible, this is a very bright judge. I was flabbergasted when I read that. He said, well, there's evidence in the record to support the verdict, but there should be more evidence. That's not his job, that's the jury's job. On the general proposition of whether a plaintiff can testify about damages, I don't disagree with that. But I think, from our perspective, that issue is really so far down the analytical road that it really isn't what we should be focusing on. I agree with that, but other issues are big problems for you too. Shouldn't we be focusing on what the Chief just said, which is, I mean, the jury instructions are a disaster. I mean, you didn't object to them? I can't remember. I mean, how did? The jury instructions. It's assumed that there's an adverse action. As Judge Rendell pointed out, it doesn't define the legal standard of adverse action, and then it talks about testimony, which I read as an implication that if the jury finds that testimony credible, it necessarily follows that there was an adverse action, which is a blatantly illogical statement. Well, apparently the charging conference and the Rule 50 argument were all mixed up together, and I have no prepared comments that I can make about the jury charge per se. Well, I would encourage you to read it. It's only 13 pages long, and it does not give the jury anything to go on as to what an adverse action is. On the timing issue, it's extremely broad. There's nothing referring to causation like cat's paw. It looks to me like everything that Judge Strauber just decided were things that the jury was never instructed had anything to do with their deliberations. Are you referring to the instructions at the first trial? I'm referring to both of them, but mainly the second trial. Okay. But both of them. It's 13 pages long from 20, 30, 70, 60. It's as if the jury wasn't there. It's the strangest case I've ever seen. It's like a judge treated it like a bench trial. Right, exactly. But then when it came time to look at it, all these legal limitations on what was to be decided that the jury was never told. And I know this wasn't really part of the case, but as trial judges, we say, okay, the jury was given this instruction, the jury did this, and then somebody says, whoa, you did it wrong. Wait a minute, wait a minute. You didn't tell us what we were supposed to do. Well, I can't really respond to that, although it would be helpful to the court. I'll go back, study the instructions, and try to come up with some comments. You'd get a headache. You'd really catch fire. Well, I wouldn't want that to happen. I wouldn't want it to happen either. But I think that the second stage of this, I came in here expecting to be arguing on the court's judgment as a matter of law rulings. But from what you're saying, it's all a mess. Well, that's really serious doubts about that. I will tell you candidly, I agree with you. The case is a mess in certain ways, and it was very hard to come in late and figure it out. Well, and that's the other thing. With 13 pages of jury instructions, and it goes, and now we'll talk about the Title VII case, and now we'll talk about the Inquiry case, and now we'll talk about the First Amendment retaliation of the jurors there. So in any event, a sign. We've got some more time left, but why don't we ask counsel to come up for a second. We're going to call a time-out. Not like your children, guys. This is not a time-out for two minutes. This is a good time-out. We'd like to talk to you about where this case goes. Okay. Thank you.